IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

PLAINTIFF,

v.

$968,367.18 IN FUNDS SEIZED FROM
ROBINHOOD MARKETS, INC.
ACCOUNT NUMBER XXXXX1342
HELD IN THE NAME OF CHOMAN
ALI,

DEFENDANT.

Civil Action No.

## VERIFIED COMPLAINT FOR FORFEITURE

COMES NOW, the United States of America, Plaintiff in the above-styled civil action, pursuant to 18 U.S.C. § § 981(a)(1)(A) and (C), and files this Verified Complaint for Forfeiture, showing the Court as follows:

1.     This is a civil forfeiture action against $968,367.18 in funds seized from Robinhood Markets, Inc. account number XXXXX1342 held in the name of Choman Ali (hereinafter, "Defendant Funds").

2.     The Defendant Funds were seized by the Federal Bureau of Investigation ("FBI") on or about November 20, 2020, pursuant to a Federal seizure warrant, from Robinhood Markets, Inc..

3.      The Defendant Funds are presently located in a secure account maintained by the United States Marshals Service.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

5.      This Court has *in rem* jurisdiction over the Defendant Funds pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district.

## Basis for Forfeiture

7.      The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that the funds are derived from proceeds traceable to violations of 18 U.S.C. §§ 1343 (wire fraud) and 1344 (bank fraud).

8.      The Defendant Funds are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957 (money laundering) or are property traceable to such property.

## Factual Background

### *The CARES Act*

9.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and was designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.

10.     One source of relief that the CARES Act provided for was the authorization of up to $349 billion in forgivable loans to small businesses for payroll, mortgage interest, rent, lease, and utilities, through a program referred to as the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized up to $310 billion in additional PPP funding.

11.     The PPP allowed qualifying small businesses and other organizations to receive PPP loans. The PPP rules required the recipient of a PPP loan to use the loan proceeds to pay payroll costs, interest on mortgages, rent, and utilities. No other use of the loan proceeds was permitted by the PPP rules.

12.     The amount of a PPP loan that a small business may have been entitled to receive was determined by the number of employees employed by the business and the business's average monthly payroll costs.

13.     In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized

representative of the business.

14.     The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.

15.     In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its (a) average monthly payroll expenses and (b) number of employees.

16.     These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.

17.     In addition, a business applying for a PPP loan had to provide documentation of its payroll expenses.

18.     The United States Small Business Administration ("SBA") was the executive branch agency of the United States government that oversaw the PPP.

19.     Individual PPP loans, however, were issued by private, SBA-approved lenders that received and processed the PPP applications and reviewed the supporting documentation, and then made loans using the lenders own funds, which were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the

course of processing the loan.

20.     The CARES Act also allowed the SBA to offer Economic Injury Disaster Loans ("EIDL") to business owners negatively affected by the pandemic.

21.     Using the SBA online portal, applicants submitted personal and business information in support of each EIDL application and affirmed that the information was true and correct under the penalty of perjury and applicable criminal statutes.

22.     The applicants provided information about the size and ownership of the business, number of employees, and gross business revenue for the past 12 months prior to the COVID-19 disaster.

23.     This information was used by SBA to calculate the principal amount of money the small business was eligible to receive.

24.     An EIDL applicant could request up to $10,000 in an EIDL cash-advance grant based on the number of people it employed.

25.     The EIDL program required that the loan proceeds be used to pay fixed debts, payroll, accounts payable, and other expenses of the applicant.

26.     EIDL proceeds and cash-advance grants were funded by the SBA and were disbursed from government-controlled accounts maintained by the United States Treasury.

**The Investigation**

***Ali's Companies***

27.     Between April and May 2020, Choman Ali ("Ali") applied for three PPP and five EIDL loans on behalf of his businesses:

- Azmars, LLC ("Azmars")

- SSBS, LLC dba American Barber Shop ("SSBS")

- RBS, LLC dba American Barber Shop ("RBS")

- Alpharetta Barber Shop, LLC

- American Barber Shop, LLC

(collectively, "Ali's businesses").

28.     The investigation revealed that Azmars is a real estate company registered in the State of Delaware and located at 12850 Hwy 9N, Alpharetta GA.

29.     Ali is the Chief Executive Officer who owns 100% of the company.

30.     BB&T account number XXXXXX1325 is Azmars' business account opened in January of 2020 (the **"Azmars account"**).

31.     Ali is the sole signer on the account.

32.     The company does not have any internet presence.

33.     SSBS is a barber shop located at 2840 Keith Bridge Rd, Cumming GA.

34.    Ali and Khalid Ahmad ("Ahmad") are equal parts owners in the company.

35.    Georgia Secretary of State records show that both Ali and Ahmad are listed as organizers in the Articles of Organization.

36.    Bank OZK account number XXXXXX0461 is SSBS' business account ("**SSBS Account**")**.**

37.    Bank records show that both Ali and Ahmad are signers on the account.

38.    RBS is a barber shop with a principal office address of 1010 Mansell Rd Suite 130, Roswell, Georgia.

39.    Ali and Beshtiwan Ali ("Beshtiwan") claim equal parts ownership in the company.

40.    Georgia Secretary of State records show that Ali is listed as the organizer in the Articles of Organization.

41.    BB&T bank account number XXXXXX4372 is RBS' business account opened in July of 2019 ("**RBS 372 Account**").

42.    Bank records reveal that both Ali and Beshtiwan are signers on the account.

43.    Alpharetta Barber Shop is a barber shop located at 5530 Windward

Pkwy Suite 220 in Alpharetta, Georgia.

44.     Ali and Anwar Adib ("Adib") claim equal parts ownership in the company.

45.     Georgia Secretary of State records show that both Ali and Adib are listed as organizers in the Articles of Organization.

46.     BB&T bank account number XXXXXX5266 is Alpharetta Barber Shop's business account opened in March of 2019 ("**Alpharetta Barber Shop Account**").

47.     Both Ali and Adib are signers on the account.

48.     American Barber Shop is a barber shop with a principal address of 415 Peachtree Pkwy, Suite 220, Cumming, Georgia.

49.     The investigation revealed that American Barber Shop has multiple locations.

50.     Ali and Beshtiwan claim equal parts ownership in the company.

51.     Georgia Secretary of State records show both Ali and Beshtiwan are listed as the organizers in the Articles of Organization.

52.     BB&T account number XXXXXX2553 is RBS's business account opened in December of 2018 ("**RBS 2553 Account**").

53.     Ali and Beshtiwan are both signers on the account.

8

## The Financial Institutions

54.     Robinhood Markets Inc. ("Robinhood") is a financial services company headquartered in Menlo Park, California. Robinhood operates as a broker-dealer and is regulated by the Financial Industry Regulatory Authority. Robinhood is registered with the Securities and Exchange Commission and is a member of the Securities Investor Protection Corporation.

55.     BB&T Bank, Bank of the Ozarks ("Bank OZK"), and Loyal Trust Bank are federally insured financial institutions with branches located in the Northern District of Georgia and elsewhere.

## The Loan Applications

56.     On or about April 7, 2020, Ali submitted to Harvest Small Business Finance, LLC ("Harvest") a PPP loan application in the name of RBS, LLC d/b/a American Barber ("RBS"), which falsely represented RBS' number of employees and average monthly payroll and promised that RBS will use the loan funds for purposes authorized by the PPP program.

57.     Harvest is an SBA-approved non-bank lender and has participated as a PPP lender to small businesses. Harvest is headquartered at Laguna Hills, California.

58.     Based on this materially false information, Harvest approved RBS's

PPP application and issued a loan in the amount of $209,860.

59.     The investigation revealed that Ali used proceeds of this loan for purposes that were not approved by PPP rules.

60.     On or about May 22, 2020, Ali submitted to Cross River Bank a PPP loan application in the name of Alpharetta Barber Shop, which falsely represented the number of Alpharetta Barber Shop's employees and promised that the applicant will use all the loan funds for purposes authorized by the PPP program.

61.     Cross River Bank is an SBA-approved lender and has participated as a PPP lender. Cross River Bank is an American State-chartered commercial banking corporation headquarter in Fort Lee, New Jersey and is an FDIC member.

62.     Based on this materially false information, Cross River Bank approved Alpharetta Barber Shop's PPP application and issued a loan in the amount of $11,868.

63.     The investigation revealed that Ali used proceeds of this loan for purposes that were not approved by PPP rules.

64.     On or about May 29, 2020, Ali submitted to Loyal Trust Bank a $208,875 PPP loan application in the name of American Barber Shop, which

falsely represented the number of American Barber Shop's employees and average monthly payroll.

65.    Loyal Trust Bank is a federally insured financial institution located in the Northern District of Georgia.

66.    Upon discovering the misrepresentation, Loyal Trust Bank approved a much smaller PPP loan for $5,800 to reflect the lower number of employees.

67.    On or about April 1, 2020, Ali submitted to the SBA an EIDL loan application in the name of American Barber Shop, LLC, which falsely represented the number of employees and the gross revenue for the past 12 months and promised that American Barber Shop will use the loan funds for purposes authorized by the EIDL program.

68.    Based on this materially false information, the SBA approved the application and issued an EIDL loan in the amount of $150,000.

69.    The investigation revealed that Ali used proceeds of this loan for purposes that were not approved by EIDL rules.

70.    On or about April 1, 2020, Ali submitted to the SBA an EIDL loan application in the name of Alpharetta Barber Shop, which falsely represented the number of Alpharetta Barber Shop's employees and promised that Alpharetta

Barber Shop will use the loan funds for purposes authorized by the EIDL program.

71.     Based on this materially false information, the SBA approved the application and issued an EIDL loan in the amount of $150,000.

72.     The investigation revealed that Ali used proceeds of this loan for purposes that were not approved by EIDL rules.

73.     On or about April 1, 2020, Ali submitted to the SBA an EIDL loan application in the name of SSBS, LLC d/b/a American Barber Shop ("SSBS"), which falsely represented the gross revenue for the past 12 months and promised that SSBS will use the loan funds for purposes authorized by the EIDL program.

74.     Based on this materially false information, SBA approved the application issued an EIDL loan in the amount of $150,000.

75.     The investigation revealed that Ali used proceeds of this loan for purposes that were not approved by EIDL rules.

76.     On or about April 1, 2020, Ali submitted to the SBA an EIDL loan application in the name of RBS, which falsely represented the number of RBS' employees and promised that RBS will use the loan funds for purposes authorized by the EIDL program.

77.     Based on this materially false information, SBA approved the

application and issued an EIDL loan in the amount of $150,000.

78.     The investigation revealed that Ali used proceeds of this loan for purposes that were not approved by EIDL rules.

79.     On or about May 16, 2020, Ali submitted to the SBA an EIDL loan application in the name of Azmars, LLC ("Azmars"), which falsely promised that Azmars will use the loan funds for purposes authorized by the EIDL program.

80.     The SBA approved the application and issued an EIDL loan in the amount of $21,500.

81.     The investigation revealed that  Ali used proceeds of this loan for purposes that were not approved by EIDL rules.

### Ali's Unauthorized Use of PPP and EIDL Loan Proceeds

#### *Alpharetta Barber Shop's EIDL Funds*

82.     On June 08, 2020, $149,900 of Alpharetta Barber Shop's EIDL funds were deposited in the **Alpharetta Barber Shop Account**.

83.     Two weeks later, on June 22, 2020, a cashier check for $150,000 was withdrawn from the **Alpharetta Barber Shop Account.**

84.     The check was written to "Cash" and had "Misc Pay SBAD Treas 310" as a memo.

85.     Seven days later, on June 29, 2020, the cashier check was deposited into the **Azmars Account**.

86.     The same day, an additional $149,900 of SSBS' EIDL funds were deposited in the **Azmars Account**.

87.     Two weeks after that, on July 13, 2020, $300,000 were transferred to BB&T bank account number 5248040906, which is Ali's personal account that had been opened in March of 2019 ("**Ali's Account**").

88.     Ali is the sole signer on the **Ali's Account**.

89.     Three days later, between July 16 and July 28, 2020, $250,000 were moved to the **Robinhood Account** via five $50,000 transfers.

90.     The investigation revealed that prior to receiving the EIDL funds the **Alpharetta Barber Shop Account** had a balance of $5,406.53.

91.     After the EIDL funds were deposited, the **Alpharetta Barber Shop Account** received $50,000 of credits between June 15 and June 22, 2020.

92.     Despite these credits, the balance of the **Alpharetta Barber Shop Account** still would not have been enough to cover the $150,000 cashier check.

93.     Similarly, prior to the $150,000 deposit, the **Azmars Account** had a balance of $73,124.87.

94.     The **Azmars Account** received $16,351.10 in deposits on July 10, 2020.

95.     Despite these deposits, the balance in **Azmars Account** was not enough to cover the subsequent transfer of $300,000 to **Ali's Account.**

96.     Furthermore, prior to the $300,000 deposit, the **Ali's Account** had a balance of $20,510.98.

97.     **Ali's Account** had additional deposits of $23,112.07 during that month.

98.     Despite these deposits, the balance still would not have been enough to cover the five subsequent transfers, totaling $250,000, into the **Robinhood Account.**

### *SSBS' EIDL Funds*

99.     On June 04, 2020, approximately $149,900 of EIDL loan funds were deposited in the **SSBS Account**.

100.    On June 22, 2020, a cashier check for $150,000 was withdrawn from the **SSBS Account**.

101.    The check was written out to "Azmars" and had "Misc Pay SBAD Treas 310" as a memo.

102.    A week later, on June 29, 2020, the cashier check was deposited in the **Azmars Account**.

103.    As explained above, an additional $150,000 (Alpharetta Barber Shop's EIDL funds) was transferred to the **Azmars Account** that day.

104.    A couple of weeks after that, on July 13, 2020, a total of $300,000 was transferred from the **Azmars Account** to **Ali's Account**.

105.    As explained above, three days later, between July 16 and July 28, 2020, $250,000 was transferred to the **Robinhood Account** via five $50,000 transfers.

106.    Prior to receipt of the EIDL funds, the balance of **SSBS Account** was $51,315.56.

107.    After the transfer, $33,184 was deposited to the **SSBS Account.**

108.    Despite these deposits, the balance was still not sufficient to cover the $150,000 cashier check that was withdrawn from the **SSBS Account** and later deposited in the **Azmars Account**.

109.    Prior to the $150,000 deposit, the **Azmars Account** did not have enough to cover the subsequent transfer to **Ali's Account.**

110.    Similarly, prior to the $300,000 deposit, **Ali's Account** did not have enough to cover the subsequent transfer to the **Robinhood Account.**

### *RBS's EIDL Funds*

111.    On June 04, 2020, $149,900 of EIDL loan funds was deposited in the **RBS 372 Account**.

112.    Six days later, on June 10, 2020, the funds were transferred to **Ali's Account.**

113.    Between June 11 and June 22, 2020, the funds were moved to the **Robinhood Account** via three $50,000 transfers, totaling $150,000.

114.    Prior to receiving of the EIDL loan funds, the balance of the **RBS 372 Account** was $41,071.14.

115.    There were additional deposits of $9,434.16 to the **RBS 372 Account.**

116.    Despite these deposits, the balance would not have been sufficient to cover the subsequent transfer to **Ali's Account**.

117.    Similarly, prior to the deposit from the **RBS 372 Account**, **Ali's Account** balance was $37,228.42, which was not enough to cover the subsequent transfers to the **Robinhood Account**.

### *RBS's PPP Funds*

118.    On May 14, 2020, approximately $209,860 of PPP loan funds was deposited into **RBS 2553 Account**.

119.    Four days later, on May 18, 2020, the funds were transferred to BB&T bank account number 5246254461, which is RBS' company account opened in July of 2019 ("**RBS 461 Account**").

120.    Bank records show that both Ali and Beshtiwan are listed as signers on the account.

121.    The next day, the funds were transferred to **Ali's Account**.

122.    From May 26 to June 08, 2020 the funds were moved to the **Robinhood Account** via three $50,000 and one $5,000 transfers, totaling $155,000**.**

123.    Prior to receiving the PPP funds, the balance of the **RBS 2553 Account** was $4,386.87, not enough to cover the subsequent transfer of $210,000 to the **RBS 461 Account**.

124.    Similarly, prior to the deposit from the **RBS 2553 Account**, the **RBS 461 Account** had a balance of $8,225.73.

125.    Although, the **RBS 461 Account** received deposits of $7,201.00, the balance of the **RBS 461 Account** was still not enough to cover the subsequent transfer to **Ali's Account**.

126.    Finally, prior to the deposit from the **RBS 461 Account**, **Ali's Account** had a balance of $119.89, which also would not have been sufficient to cover the subsequent transfers to **the Robinhood Account**.

127.    On or about November 20, 2020, the FBI seized the Defendant Funds pursuant to a Federal seizure warrant.

## **CONCLUSION**

128.    Based on the forgoing, the Defendant Funds are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that they are proceeds, or are derived from proceeds, traceable to violations of 18 U.S.C. §§ 1343 (wire fraud) and 1344 (bank fraud).

129.    The Defendant Funds are also subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957 (money laundering) or are property traceable to such property.

WHEREFORE, the United States prays:

(1)    that the Court forfeit the Defendant Funds to the United States of America;

(2)    that the Court award Plaintiff the costs of this action; and

(3)    that Plaintiff have such other and further relief as the Court deems just and proper under the facts and circumstances of this case.

This 24th day of January 2022.

Respectfully submitted,

KURT R. ERSKINE
    *United States Attorney*

*Radka T. Nations*

RADKA T. NATIONS
*Assistant United States Attorney*
Georgia Bar No. 618248
600 U.S. Courthouse
75 Ted Turner Drive, S.W.
Atlanta, GA 30303
Telephone: (404) 581-6000

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

    PLAINTIFF,

    v.

$968,367.18 IN FUNDS SEIZED FROM
ROBINHOOD MARKETS, INC.
ACCOUNT NUMBER XXXXX1342
HELD IN THE NAME OF CHOMAN
ALI,

    DEFENDANT.

Civil Action No.

## **VERIFICATION OF COMPLAINT FOR FORFEITURE**

I, Monika Staeva, have read the Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my knowledge and belief based upon my personal knowledge of the case and upon information obtained from other law enforcement personnel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 24th day of January 2022.

*Monika Staeva*
_____
Special Agent Monika Staeva
Federal Bureau of Investigation